UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


DEVIN BARNES                    CIVIL ACTION NO: 2:14:cv:02020

VERSUS                          CHIEF JUDGE: SARAH S. VANCE

QUALITY FAB & MECHANICAL,       MAGISTRATE: DANIEL E.

L.L.C., et al                   KNOWLES, III


          Deposition of DEVIN R. BARNES, 60320 South
Mill, Lacombe, Louisiana, taken in the law offices of
SCHONEKAS, EVANS, MCGOEY & MCEACHIN, LLC, 909 Poydras
Street, Suite 1600, New Orleans, Louisiana 70112, on the
30th day of September, 2015.


REPORTED BY:

     CONNIE M. FINESCHI, CCR
     CERTIFIED COURT REPORTER

**EXHIBIT 1**

DEVIN BARNES                                          September 30, 2015

```
 1            MR. SPIEGEL:
 2                 That's okay.
 3   EXAMINATION BY MR. MCGOEY:
 4        Q.    You listed your employment history.  So
 5   at the top you've got Kangaroo.  Reason for
 6   leaving, had to move.  So did you represent to Mr.
 7   Bourgeois in your application that you were
 8   leaving Kangaroo because you had to move to the
 9   south shore?
10        A.    Uh-huh (indicating affirmatively).
11        Q.    Not because you had been charged with
12   felony theft, right?
13        A.    Reason for leaving, had to move.
14        Q.    Yes.
15        A.    Had to move to my father's.
16        Q.    And then your salary at Kangaroo, you
17   were making $33,475 a year?
18        A.    Correct.
19        Q.    And you understood, did you not, that
20   you were being offered a job making 550 a week as
21   an assistant manager at St. Rose?
22        A.    Yes.
23        Q.    That's less money than you were making
24   at Kangaroo, right?
25        A.    Yes.
```

DEVIN BARNES                                                      September 30, 2015

Page 54

```
 1        A.    St. Rose.
 2        Q.    Take a look at page 30.  This says
 3   Violence in the Workplace.  Did you understand
 4   that if you were a victim of violence in the
 5   workplace, the company policy was for you to
 6   report it to a supervisor?
 7        A.    Yes.  I mean from my experience with
 8   past companies, not from this job.
 9        Q.    And your supervisor or immediate boss at
10   St. Rose Driving Range was Ms. Peggy Labit?
11        A.    Correct.
12        Q.    Turn to the next page, page 31, under
13   the heading C, Harassment.  It says, "Types of
14   harassment:  Hostile environment, intimidating,
15   hostile, or offensive behavior towards a person or
16   persons, or the creation of an intimidating,
17   hostile, or offensive environment for such
18   persons, in an employment setting because of the
19   person's national origin, race, color, religion,
20   sex, disability, or age."
21             Then under that the heading Prevention,
22   No. 2, "Employees can stop harassment by reporting
23   any signs of harassment to a supervisor."  Did you
24   understand that St. Rose Driving Range's policy on
25   sexual harassment were for you, if you were a
```

DEVIN BARNES                                    September 30, 2015

```
 1          A.   Correct.
 2          Q.   What day is that referring to?
 3          A.   Friday.
 4          Q.   Friday, December 6th?
 5          A.   Correct.
 6          Q.   So tell me about Friday, December 6th.
 7   What did you do that day?  Did you work?
 8          A.   Yes.
 9          Q.   At St. Rose Driving Range?
10          A.   Correct.
11          Q.   Morning, afternoon shift?
12          A.   Afternoon.  No, night shift, late
13   afternoon.
14          Q.   Okay.  4:00 to close?
15          A.   Yes.
16          Q.   And were you vomiting at work?
17          A.   No.
18          Q.   So your vomiting took place before?
19          A.   Correct.
20          Q.   Did you have a headache when you were
21   working?
22          A.   Yes.
23          Q.   How many times did you vomit that day?
24          A.   That night, I think three.
25          Q.   That night meaning after the attack, the
```

DEVIN BARNES                                    September 30, 2015

Page 130

```
 1    on site alone?
 2          A.    Without Ms. Peggy?
 3          Q.    Yes.
 4          A.    Yeah.   When she would leave, I would
 5    work by myself.
 6          Q.    Right.   You-all worked different shifts.
 7    She would primarily work the morning shift?
 8          A.    Yes.
 9          Q.    And you primarily worked the night
10    shift?
11          A.    Yes.
12          Q.    Sometimes you would work a morning
13    shift?
14          A.    Yes.
15          Q.    And sometimes she would work a night
16    shift?
17          A.    Yes.
18          Q.    But for the most part you didn't work
19    shifts together.   Is that accurate?
20          A.    For the most part.
21          Q.    On how many occasions do you recall
22    being a manager on the shift and Ms. Peggy also
23    working?
24          A.    Every steak night.
25          Q.    And when is steak night?
```

DEVIN BARNES                                          September 30, 2015

Page 139

```
 1        Q.    On the days that you worked shifts with
 2   Ms. Peggy, did she leave during the shift?
 3        A.    Yes.
 4        Q.    How often?
 5        A.    For personal, I don't recall.  But for
 6   business she would leave when she would need to
 7   leave.
 8        Q.    I was talking personal, not business.
 9   You don't recall?
10        A.    I don't recall.
11        Q.    Now, when you worked a shift without Ms.
12   Peggy, who else worked on the shift, what other
13   positions?  Bartender?
14        A.    Bartender.
15        Q.    What else?
16        A.    Pro shop.
17        Q.    Pro shop.
18        A.    And ball picker.
19        Q.    And ball picker.  Anything else?
20        A.    Cook.
21        Q.    So on a typical shift that you worked,
22   there were four other people working at St. Rose
23   Driving Range, bartender, pro shop, ball picker,
24   and the cook?
25        A.    Correct.
```

DEVIN BARNES                                           September 30, 2015

Page 140

1       Q.    And as far as the hierarchy on those
2   shifts, you were their boss on those shifts?
3       A.    Yes.
4       Q.    So as assistant manager each night shift
5   the bartender, the pro shop, the ball picker, and
6   the cook reported to you?
7       A.    No, not all of them.   Just the bartender
8   and pro shop.
9       Q.    As assistant manager you couldn't tell
10  the ball picker what to do?
11      A.    No.   He had his own manager.   Now, if I
12  needed him to go do something, I believe he
13  probably would -- I don't.
14      Q.    Tell me about the ball picker manager,
15  who was that?
16      A.    Marty.
17      Q.    Did Marty work -- How many shifts a week
18  did Marty work as the ball picker manager?
19      A.    I have no idea.
20      Q.    Well, did he work -- Was there always a
21  manager of the ball picker working?
22      A.    No.
23      Q.    What did the ball picker manager do?
24      A.    He worked there.
25      Q.    What was his job?   What did he do?

DEVIN BARNES                                        September 30, 2015

```
 1    would go out and ask him to do something.  If he
 2    needed something, he would call his manager.
 3         Q.   Who did the cook report to?
 4         A.   Ms. Peggy.
 5         Q.   When Ms. Peggy wasn't there and you were
 6    the only manager, who did the cook report to?
 7         A.   Ms. Peggy.
 8         Q.   So the cook didn't report to you?
 9         A.   No.  He would call Ms. Peggy.
10         Q.   Based on your testimony, it's my
11    understanding that every night shift you worked
12    where you were the only manager on site, you had
13    two employees report to you, the bartender and the
14    pro shop person; is that correct?
15         A.   Correct.
16         Q.   All right.  And you oversaw their jobs,
17    right, what the bartender and the pro shop person
18    did?
19         A.   Right.
20         Q.   You told them -- If you saw them doing
21    something incorrect, you corrected them, right?
22         A.   Right.
23         Q.   You have to answer my question, right?
24         A.   I did.  Yes.
25         Q.   And that was part of your job to let
```

DEVIN BARNES                                    September 30, 2015

Page 143

1  them know if they were doing something that they
2  weren't supposed to do?
3        A.    Correct.
4        Q.    Was it also your job to oversee to make
5  sure that they weren't stealing from the till,
6  from the cash register?
7              MR. SPIEGEL:
8                   Object to the form of the question.
9  EXAMINATION BY MR. MCGOEY:
10       Q.    As assistant manager was one of your
11 responsibilities to make sure that the bartender
12 wasn't stealing from the St. Rose Driving Range?
13       A.    Stand over there and make sure they
14 weren't stealing, or at the end of the night count
15 down the register is what you're asking?
16       Q.    Well, we can break it down if that makes
17 you feel better.
18       A.    That's what I'm asking.
19       Q.    Well, you did it at the end of the
20 night, right?
21       A.    Yeah.  I counted their till with them.
22       Q.    Okay.  And when you were an assistant
23 manager on a shift and you oversaw the bartender?
24       A.    Uh-huh (indicating affirmatively).
25       Q.    Wasn't it your responsibility to notice

DEVIN BARNES                                    September 30, 2015

Page 144

 1    to see if, hey, this bartender puts money in her
 2    pocket and not going in the register?
 3         A.    No.
 4         Q.    No.  So all you were worried about is
 5    the end the night making sure that the register
 6    added up to what was in there?
 7         A.    Right.  They counted their own till and
 8    we entered it into the computer together.
 9         Q.    Were you responsible for making sure
10    that the bartender didn't talk on the phone during
11    the job?
12         A.    Yes.
13         Q.    So you were responsible for overseeing
14    the bartender on the phone, but it's your
15    testimony you are not responsible for telling the
16    bartender, "I see you stealing money"?
17         A.    I mean I think if I would have seen her
18    stealing money, I probably would have said
19    something.
20         Q.    But that was not your job
21    responsibility?
22         A.    It's not my job responsibility to stand
23    there and babysit her.
24         Q.    What was your responsibility with the
25    person who worked in the pro shop?

DEVIN BARNES                                    September 30, 2015

Page 145

```
 1          A.    To help her.
 2          Q.    Did she report to you?
 3          A.    Yes.
 4          Q.    And did you at the end of the night make
 5    sure her till checked out?
 6          A.    We did it together.
 7          Q.    Who was responsible for putting it in
 8    the computer, you or the pro shop attendee?
 9          A.    Putting the till into the computer or
10    the numbers?
11          Q.    The numbers.
12          A.    I typed them into the computer.
13          Q.    And then you also took the cash.  You
14    were responsible for the cash at the end of the
15    shift, right?
16          A.    Yes, after it was counted.
17          Q.    And you were responsible for putting
18    that in the safe?
19          A.    Yeah.
20          Q.    And you were also responsible for
21    preparing an inventory nightly, correct?
22          A.    Correct.
23          Q.    And you e-mailed that inventory to Ms.
24    Lorna?
25          A.    Yes.
```

DEVIN BARNES                                    September 30, 2015

```
 1        Q.   Now, as assistant manager did you have
 2   authority to fire an employee?
 3        A.   No.
 4        Q.   No.  Who told you that?
 5        A.   I'm pretty sure Bruce, Ms. Lorna, and
 6   Ms. Peggy.
 7        Q.   So if you saw the bartender stealing,
 8   you didn't have the authority to fire them?
 9        A.   No.  I reported it is to Ms. Peggy and
10   Mr. Bruce and Ms. Lorna.
11        Q.   Did you have authority to hire anyone?
12        A.   No.
13        Q.   Besides reporting any of these
14   incidents, did you have the authority to recommend
15   hiring or firing someone?
16        A.   Recommend to hire someone?
17        Q.   Yeah.
18        A.   Yeah.
19        Q.   Did you have keys to the St. Rose
20   Driving Range?
21        A.   Yes.
22        Q.   Did you ever access the building on any
23   occasions with your keys when you weren't there to
24   work on a shift?
25        A.   No.
```

DEVIN BARNES                                    September 30, 2015

Page 153

```
 1    nothing to do with cash.  This has to do with
 2    sales.
 3         Q.   All right.  What about cash?
 4         A.   The cash goes -- Ask your question.
 5         Q.   What was your responsibility about the
 6    cash?
 7         A.   The cash goes into an envelope and Ms.
 8    Peggy deals with it in the morning.
 9         Q.   You don't count the cash?
10         A.   I count the $100 till or I don't
11    remember what the till was.  I think it was 150
12    maybe.  I might be wrong when I'm saying the 100,
13    and I just count to make sure that's the right
14    amount and put it back into the safe.
15         Q.   Were you also responsible for nightly
16    inventories I think you said?
17         A.   Yes.
18         Q.   I'll show you what I'm going to mark as
19    Exhibit 109, which is one of the inventories
20    produced in this case.  It doesn't have a Bates
21    stamp number because they were produced in the
22    native format in PDF.
23              (Document marked for identification as
24              Exhibit 109.)
25    EXAMINATION BY MR. MCGOEY:
```

DEVIN BARNES                                          September 30, 2015

```
 1              THE WITNESS:
 2                   It's a blank inventory list.
 3   EXAMINATION BY MR. MCGOEY:
 4         Q.   And what is this inventory for?
 5         A.   Liquor.
 6         Q.   For the bar or for La Maison?
 7         A.   It don't say.
 8         Q.   I'm asking you do you recognize the
 9   form?  Is this a form that you completed on a
10   daily basis?
11         A.   No.
12         Q.   Have you ever seen this form before?
13         A.   Yes.
14         Q.   Why was she sending it to you?
15         A.   It's a liquor inventory.
16         Q.   Why was she sending it to you?
17         A.   To do liquor inventory.  That was not
18   completed daily.  It's completed monthly.
19         Q.   So you were responsible for a monthly
20   liquor inventory?
21         A.   Yes.
22         Q.   At the bar?
23         A.   At the bar.
24         Q.   Nightly you had to compile an inventory
25   of the beer?
```

DEVIN BARNES                                September 30, 2015

1        A.     Beer.

2        Q.     And monthly for liquor?

3        A.     Yeah, me and Cherie.

4        Q.     Those were responsibilities you had as

5   the assistant manager?

6        A.     Yes.

7        Q.     I'm going to show you another e-mail,

8   October 6, 2013 that I'm going to mark as Exhibit

9   111.

10              (Document marked for identification as

11              Exhibit 111.)

12  EXAMINATION BY MR. MCGOEY:

13       Q.     This is an e-mail from you, Devin at

14  Quality Fab Mechanical on behalf of St. Rose

15  Driving Range, to Ms. Luana for the sales

16  receipts.  It says, "Liquor needed.  Ms. Luana,

17  could you send me an updated inventory please.

18  Thank you, Devin."  What is this about?

19       A.     It's two separate things actually.  This

20  is -- I needed the updated inventory list from

21  her, and then this is an order that I needed her

22  to have prepared when I come to pick up.

23       Q.     So for St. Rose Driving Range, you-all

24  bought liquor from La Maison?

25       A.     Yes.  When we order it, yes.

DEVIN BARNES                                        September 30, 2015

```
 1        A.    Correct.  And if I wasn't doing it, it
 2   was the girls helping me out.
 3        Q.    They had access to the computer?
 4        A.    No, no, counting.  I'm sorry.  I should
 5   have brought that up.
 6        Q.    You're the only person that had access
 7   to the computer?
 8        A.    Me, Ms. Lorna, and Ms. Peggy.
 9        Q.    I'll show you what I'll mark as Exhibit
10   113, which is an e-mail from you to Mr. Bruce, Ms.
11   Lisa, and Ms. Lorna regarding shortage ending
12   week, 7/31/2013.
13             (Document marked for identification as
14             Exhibit 113.)
15   EXAMINATION BY MR. MCGOEY:
16        Q.    Can you tell me what this is?
17        A.    This is the report I would send for the
18   beer shortage.
19        Q.    And what does shortage mean?
20        A.    The beer shortage.
21        Q.    What's the beer shortage?  I don't
22   understand what that is.
23        A.    When -- This program here --
24        Q.    Yes.
25        A.    -- would be inputted on this.  These
```

DEVIN BARNES                                        September 30, 2015

                                                            Page 161

1    numbers would go on here.

2         Q.    So you were responsible on a daily basis

3    for finding out whether or not there was a beer

4    shortage, one beer can, two beer cans, three beer

5    cans?

6         A.    Correct.   And the girls were charged.

7    Whoever worked pro shop a.m., whoever worked pro

8    shop p.m. were charged if the pro shop was short.

9         Q.    And you implemented that policy, which

10   was if a bartender's till -- there was a shortage

11   in the beer cans, that they were charged it?

12        A.    No, I never implemented that policy.

13        Q.    You had nothing to do with that policy?

14        A.    Ms. Lorna implemented that policy.

15        Q.    And as assistant manager you enforced

16   it?

17        A.    Yes.

18        Q.    I'll show you another document I'm going

19   to mark as Exhibit 114, another e-mail from you

20   titled, "Over Short Report For the Week Of The 15

21   Thru the 21."

22             (Document marked for identification as

23             Exhibit 114.)

24   EXAMINATION BY MR. MCGOEY:

25        Q.    What is this report?

DEVIN BARNES                                    September 30, 2015

Page 163

```
 1              MR. SPIEGEL:
 2                   Object to the form of the question.
 3              There is multiple definitions of the
 4              word "promotions."
 5  EXAMINATION BY MR. MCGOEY:
 6       Q.   I'll show you what I'm going to mark as
 7  Exhibit 115 and ask you to take a look at it.
 8              (Document marked for identification as
 9              Exhibit 115.)
10  EXAMINATION BY MR. MCGOEY:
11       Q.   This is an e-mail from Bruce to Peggy
12  and you dated July 8, 2013 stating, "Need help
13  promoting Sunday business, want to get with you
14  guys and brainstorm."  Do you recall that?
15       A.   The e-mail?
16       Q.   Yes.
17       A.   Yes.
18       Q.   What was this in reference to?
19       A.   Promoting.
20       Q.   So was one of your job responsibilities
21  as assistant manager at St. Rose Driving Range to
22  help promote the business?
23       A.   Yes.
24       Q.   I'll show you a document I'm going to
25  mark as 116, which is an e-mail from you to
```

DEVIN BARNES                                      September 30, 2015

```
 1    your personal music and videos?
 2         A.   For bar music and videos.
 3         Q.   But not downloading for yourselves?
 4         A.   No.
 5         Q.   I'm going to show you a document I'm
 6    going to mark as Exhibit 117 and ask you to take a
 7    look at it.
 8              (Document marked for identification as
 9              Exhibit 117.)
10    EXAMINATION BY MR. MCGOEY:
11         Q.   It's an August 21, 2013 e-mail from you
12    to Peggy saying, "Please relay to your all
13    employees that there is no getting on Internet nor
14    downloading any type of music or video on POS
15    system computers."  Did you send that e-mail to
16    Peggy?
17         A.   Yeah, downloading.
18         Q.   You sent that e-mail?
19         A.   Yes.
20         Q.   Why did you send that e-mail, because it
21    was part of your job responsibility to make sure
22    that didn't occur?
23         A.   When the registers went down, that was
24    one of the -- I think one of the problems that
25    happened with our registers going down all the
```

DEVIN BARNES                                         September 30, 2015

Page 167

```
 1    time.
 2         Q.    Were you responsible for making sure
 3    labor and liquor costs didn't go over certain
 4    percentages for the business?
 5         A.    No.
 6         Q.    You didn't have any responsibility for
 7    overseeing the cost of liquor or labor with
 8    respect to sales?
 9         A.    No.
10         Q.    Were you responsible for as an assistant
11    manager telling the employees who could be behind
12    the bar and who couldn't be behind the bar?
13         A.    Yes.
14         Q.    So you admit as assistant manager you
15    had authority to tell people where they could be
16    and where they couldn't be?
17         A.    Customers you're asking?
18         Q.    No.  I'm talking about employees?
19         A.    Why wouldn't they -- I'm sorry.
20         Q.    A pro shop person, they reported to you,
21    right?
22         A.    Right.
23         Q.    You admit to that, right?
24         A.    Yes.
25         Q.    Could they get behind the bar?
```

DEVIN BARNES                                September 30, 2015

Page 168

 1        A.    If they needed to go get beer.
 2        Q.    And you couldn't -- Did you ever
 3   instruct them not to go behind the bar?
 4        A.    No.   They needed to get back there.   Why
 5   would I instruct them not to?
 6        Q.    Did you ever instruct the outside
 7   workers that they couldn't go behind the bar?
 8        A.    Yes.   Outside worker, not outside.
 9        Q.    So you had authority over the outside
10   worker, that would be the ball picker --
11        A.    No.
12        Q.    -- when he came inside?
13        A.    The outside girl.
14        Q.    Waitress?
15        A.    Waitress.
16        Q.    So that's someone else that would work
17   there that reported to you?
18        A.    Yes.
19        Q.    So you had authority to tell the
20   waitress not to go behind the bar?
21        A.    Yes.
22        Q.    And did you do that?
23        A.    Yes.
24        Q.    Did you also have authority to tell
25   employees they couldn't use their cell phone while

DEVIN BARNES                                        September 30, 2015

Page 169

1    working?

2            A.     I believe so, yes.

3            Q.     So that was part of your authority to

4    make sure none of the employees use their cell

5    phone while they were working?

6            A.     Yes.

7            Q.     Did that include the ball picker?

8            A.     No.

9            Q.     You didn't have authority over the ball

10   picker?

11           A.     No.   If I had a problem, I'll call

12   Marty.

13           Q.     Waitress?

14           A.     Yes.

15           Q.     You would tell her not to use her cell

16   phone?

17           A.     Yes.

18           Q.     Pro shop girl?

19           A.     Yes.

20           Q.     Bartender?

21           A.     Depending on what bartender.

22           Q.     Some bartenders you would?

23           A.     All the bartenders besides the bar

24   manager.

25           Q.     Were you responsible for ordering liquor

DEVIN BARNES                                      September 30, 2015

Page 172

1   the St. Rose Driving Range.  So to keep the
2   inventory correct, we would have to do a physical
3   order on the computer through La Maison, not a
4   liquor company.  If we needed to order extra
5   liquor from a liquor company, Ms. Peggy did the
6   ordering.
7        Q.   Okay.  But when you did, did you do the
8   ordering on the computer from La Maison?
9        A.   If I needed liquor there, yes.
10        Q.   Okay.  And when you did that, you
11   prepared an invoice from La Maison -- I mean from
12   St. Rose Driving Range to La Maison, right?
13        A.   Yes.
14        Q.   And St. Rose paid La Maison?
15        A.   I have no idea.  That's nothing to do
16   with me.
17        Q.   You don't consider that ordering liquor?
18        A.   I don't know how they paid them.  I have
19   no idea.  That had nothing to do with me.  I would
20   type up a liquor inventory and fax it or e-mail it
21   to her.  If you look at one of the exhibits it
22   says zero dollars at the bottom.
23        Q.   Were you responsible for locking the bar
24   every night at the end of the shift?
25        A.   Yes.

DEVIN BARNES                                    September 30, 2015

Page 173

1        Q.    And you were responsible for securing
2    the cash?
3        A.    Yes.
4        Q.    How much time on your shift did you sell
5    drinks and food?
6        A.    I'm sorry.  Just give me a second.
7        Q.    You want to take a break?
8        A.    Yes, I would like to take a break.  Can
9    I step outside?
10       Q.    Absolutely.  Absolutely.
11             (Break taken.)
12   EXAMINATION BY MR. MCGOEY:
13       Q.    Mr. Barnes, we went through a lot of
14   these reports where you were preparing
15   inventories.  Approximately how much time did you
16   spend on each shift on counting or preparing
17   inventories?
18       A.    At the beginning of the shift anywhere
19   between 30 to an hour, 30 minutes to an hour, and
20   at the end of the shift about 30 minutes.
21       Q.    So between an hour to an hour and a half
22   each shift that you worked you were dealing with
23   inventory issues.  Is that fair to say?
24       A.    Yeah.
25       Q.    And then approximately how long did it

DEVIN BARNES                                    September 30, 2015

Page 174

1   take you on each shift to deal with counting the
2   till and overseeing the bartender and the cash
3   receipts and those things?
4        A.    Twenty minutes.
5        Q.    How many bartenders would there be every
6   night, just one?
7        A.    One bartender.
8        Q.    All right.  So about two hours every
9   shift you were either doing the inventory or
10  checking the cash of the bartender at the end of
11  the night.  Is that accurate?
12       A.    Yes.
13       Q.    How much each shift did you spend
14  selling drinks or working the bar yourself?
15            MR. SPIEGEL:
16                I'm going to object to the form of
17            the question.  Can you specify a date?
18  EXAMINATION BY MR. MCGOEY:
19       Q.    Just typical.  Typically on a shift how
20  much did you either work the bar or wait tables,
21  things like that?
22       A.    Just about every shift.
23       Q.    Every shift.  What percent?  You know,
24  I'm just trying to get a gauge.  An hour a shift?
25  I mean you come on at 4:00.  Did you bartend right

DEVIN BARNES                                    September 30, 2015

1    computer, and then the laptop came later.

2         Q.   And that was setting up those.  What

3    about schedules, did you prepare schedules?

4         A.   No.

5         Q.   Who did that?

6         A.   Ms. Peggy.

7         Q.   What about disciplining employees, did

8    you ever write anybody up?

9         A.   No.

10        Q.   Did you have the authority to do that?

11        A.   No.

12        Q.   If you saw somebody doing something

13   wrong, what did you understand your responsibility

14   to be?

15        A.   Report it to Ms. Peggy.

16        Q.   Did you ever do that?

17        A.   Yes.

18        Q.   What did you report to Ms. Peggy that

19   you saw going on?

20        A.   I don't remember.  I mean, there was

21   many things.  I would just text her and tell her

22   what's going on or call her and tell her.

23        Q.   So approximately how much of your time

24   working at the St. St. Rose Driving Range did you

25   do either inventory and, slash, clerical work and

DEVIN BARNES                                    September 30, 2015

Page 184

1          Q.   And how much of time did you spend on
2     the shifts doing the cleaning up is what I'm
3     trying to get?
4          A.   A hour at night cleaning.
5          Q.   Did Ms. Peggy do cleanup like you?
6          A.   Yeah, on her shifts.
7          Q.   So a couple hours for inventory and
8     counting the register, an hour for cleaning up,
9     and the rest of your time was assisting people who
10    needed assisting.  Is that accurate?
11         A.   Yeah.  Walking around assisting,
12    talking.
13         Q.   Did you have any responsibility for
14    making sure your customers were happy?
15         A.   Yeah.
16         Q.   If someone was complaining about a meal,
17    that's something you would deal with?
18         A.   Yeah.
19         Q.   Did you have the authority to comp a
20    meal?
21         A.   Yes.
22         Q.   You had authority to go into the
23    computer and override a bartender's order?
24         A.   Yes.
25         Q.   Did you ever complain to Mr. Bourgeois

DEVIN BARNES                                    September 30, 2015

Page 187

```
 1        A.    Who?
 2        Q.    Nick Monk?
 3        A.    Yes, I know him.
 4        Q.    Did you ever complain to Nick Monk at
 5   the St. Rose Driving Range that you weren't paid
 6   enough?
 7        A.    No.
 8        Q.    You never said that?
 9        A.    Not that I recall.
10        Q.    Do you recall ever having any
11   conversations with Nick Monk or do you recall ever
12   seeing Nick Monk at the St. Rose Driving Range?
13        A.    Yes.
14        Q.    When do you recall seeing him?
15        A.    I don't know.
16        Q.    Was he with his wife?
17        A.    On what occasion?
18        Q.    When you saw him at the St. Rose Driving
19   Range.
20        A.    There was multiple times I seen him at
21   the St. Rose Driving Range, multiple times I seen
22   him separately, with his wife.
23        Q.    Did you make more money than the pro
24   shop girl?
25        A.    I believe so.
```

ON THE RECORD, INC.
(504) 378-3850

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | |
|---|---|---|---|---|---|---|---|---|
| | BEER | BEER Cans | BEER Cans | BEER Cans | BEER Cans | | | |
| BUD LITE | 1.75 | | 74 | 20 | 554 | 558 | -4 | -7 |
| BUDWEISER | 1.75 | | 30 | 10 | 270 | 271 | -1 | -1.75 |
| COOR LITE | 1.75 | | 38 | 6 | 182 | 182 | 0 | |
| MICHELOB ULTRA | 1.75 | | 39 | 3 | 111 | 112 | -1 | -1.75 |
| MILLER HIGH LIFE | 1.75 | | 8 | 1 | 32 | 32 | 0 | |
| MILLER LITE | 1.75 | | 67 | 7 | 235 | 235 | 0 | |
| BARREL | | | | | 0 | | 0 | |
| | | | | | 1384 | 1390 | -6 | -10.5 |
| ABITA AMBER | 3.00 | 6 | 18 | 3 | 96 | 96 | 0 | |
| ABITA STRAWBERRY (SEASONAL) | | | | | 0 | | 0 | |
| BUD ICE | 2.75 | 6 | 8 | 1 | 38 | 38 | 0 | |
| BUD LIGHT LIME | 2.25 | 6 | 10 | 1 | 40 | 40 | 0 | |
| BUD LIGHT PLATIUM | 2.75 | 6 | 11 | 4 | 113 | 113 | 0 | |
| BUD LITE | 2.25 | | 91 | 15 | 451 | 450 | 1 | 2.25 |
| BUD SELECT 55 | 2.25 | 6 | 15 | 3 | 93 | 93 | 0 | |
| BUDWEISER | 2.25 | | 33 | 6 | 177 | 177 | 0 | |
| BUDWEISER SELECT | 2.25 | 12 | 11 | 3 | 95 | 95 | 0 | |
| COOR LITE | 2.25 | | 63 | 6 | 183 | 183 | 0 | |



**EXHIBIT**

**EXHIBIT 1-109**

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | |
|---|---|---|---|---|---|---|---|---|
| CORONA | 3.00 | 12 | 3 | 5 | 135 | 136 | -1 | -3 |
| DESEQUIS | 3.00 | | 10 | 3 | 82 | 82 | 0 | |
| HEINEKEN | 3.00 | 12 | 10 | 2 | 70 | 70 | 0 | |
| HEINEKEN LITE | 3.00 | 8 | 21 | 1 | 51 | 51 | 0 | |
| MICHELOB ULTRA | 2.25 | | 3 | 5 | 123 | 122 | 1 | 2.25 |
| MILLER 64 | 2.25 | 6 | 15 | 2 | 69 | 69 | 0 | |
| MILLER HIGH LIFE | 2.25 | | 8 | 2 | 56 | 56 | 0 | |
| MILLER LITE | 2.25 | | 67 | 4 | 163 | 162 | 1 | 2.25 |
| ODOULS | 2.25 | | 4 | 1 | 28 | 28 | 0 | |
| SHOCKTOP | 3.00 | 12 | 9 | 3 | 93 | 93 | 0 | |
| SMIRNOFF STRAWBERRY | 2.25 | | 7 | 1 | 31 | 31 | 0 | |
| ST. PAULIE GIRL | 3.00 | | 10 | 4 | 106 | 106 | 0 | |
| STELLA ARTOIS | 3.00 | 12 | 10 | 3 | 94 | 94 | 0 | |
| | | | | | **2387** | **2385** | **2** | **3.75** |
| BARQ'S | 1.50 | | 24 | 1 | 49 | 49 | 0 | -3 |
| COKE | 1.50 | 16 | 26 | 2 | 92 | 91 | 1 | 1.5 |
| COKE ZERO | 1.50 | 8 | 18 | 1 | 51 | 51 | 0 | |
| DIET BARQ'S | 1.50 | 16 | 12 | 1 | 53 | 53 | 0 | |
| DIET COKE | 1.50 | 20 | 10 | 2 | 80 | 80 | 0 | |
| DIET DR. PEPPER | 1.50 | | 12 | 2 | 62 | 62 | 0 | |

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | |
|---|---|---|---|---|---|---|---|---|
| DR PEPPER | 1.50 | 20 | 27 | 1 | 72 | 74 | -2 | 3 |
| FUZE TEA | 2.00 | 20 | 20 | 2 | 90 | 91 | -1 | 2 |
| MINUTE MAID | 1.50 | | 16 | 1 | 41 | 41 | 0 | |
| POWERADE (BLUE) | 1.75 | | 13 | 2 | 63 | 63 | 0 | |
| POWERADE (ORANGE) | 1.75 | | 6 | 2 | 56 | 56 | 0 | |
| POWERADE (RED) | 1.75 | | 23 | 1 | 48 | 48 | 0 | |
| POWERADE (YELLOW) | 1.75 | | 26 | 2 | 76 | 76 | 0 | |
| POWERADE (PINK) | 1.75 | | 21 | 2 | 71 | 71 | 0 | |
| SPRITE | 1.50 | 16 | 20 | 1 | 61 | 61 | 0 | |
| TUM-E-YUMMIES | 0.00 | | | | 0 | | 0 | |
| VITAMIN WATER | 2.00 | | 15 | 2 | 65 | 65 | 0 | |
| WATER (PLAIN) | 1.50 | 12 | 36 | 6 | 198 | 200 | 2 | 3 |
| | | | | | 1228 | 1230 | -2 | -3.5 |

**From:**                devin@qualityfabmechanical.com on behalf of Devin St Rose Driving Range
                                            <devin@strosedrivingrange.com>
**Sent:**                Thursday, August 1, 2013 8:20 PM
**To:**                   Bruce Bourgeois; Lorna Bourgeois; Lisa Saunders
**Subject:**           Week of 07/25/2013 thru 07/31/2013
**Attachments:**     shortage ending week of 07312013.xls

**EXHIBIT**

113

**EXHIBIT**

**1-113**

SRDR-000292

**PRO SHOP**

DATE **7/29/2013**

**MONDAY**

PRO SHOP (am) Name EMILY

PRO SHOP (pm) Name MELISSA

PRO SHOP (outside pm) Name BRE

SHORTAGE AMOUNT $      $     14.25

DATE **7/30/2013**

**TUESDAY**

PRO SHOP (am) Name MELISSA

PRO SHOP (pm) Name ALICIA

PRO SHOP (outside pm) Name EMILY

SHORTAGE AMOUNT $      $     3.00

DATE **7/31/2013**

**WEDNESDAY**

PRO SHOP (am) Name KALI

PRO SHOP (pm) Name MELISSA/BRE

PRO SHOP (outside pm) Name HEATHER C

SHORTAGE AMOUNT $      $     -

DATE **7/25/2013**

**THURSDAY**

PRO SHOP (am) Name EMILY

PRO SHOP (pm) Name ALICIA

PRO SHOP (outside pm) Name HEATHER B

SHORTAGE AMOUNT $      $     -

DATE **7/26/2013**

**FRIDAY**

PRO SHOP (am) Name MELISSA

PRO SHOP (pm) Name KALI

PRO SHOP (outside pm) Name EMILY

SHORTAGE AMOUNT $      $     -

DATE **7/27/2013**

**SATURDAY**

PRO SHOP (am) Name HEATHER C

PRO SHOP (pm) Name MELISSA

PRO SHOP (outside pm) Name BRE

SHORTAGE AMOUNT $      $     -

DATE **7/28/2013**

**SUNDAY**

PRO SHOP (am) Name NATALIE

PRO SHOP (pm) Name ALICIA

PRO SHOP (outside pm) Name

SHORTAGE AMOUNT $

$     17.25

SRDR-000293

**BAR**

| | |
|---|---|
| DATE | 7/29/2013 |
| **MONDAY** | |
| BARTENDER (am) Name | NATALIE |
| BARTENDER (pm) Name | HEATHER B |
| BARTENDER (outside pm) Name | BRE |
| SHORTAGE AMOUNT | $          $      32.00 |

| | |
|---|---|
| DATE | 7/30/2013 |
| **TUESDAY** | |
| BARTENDER (am) Name | NATALIE |
| BARTENDER (pm) Name | HEATHER C |
| BARTENDER (outside pm) Name | EMILY |
| SHORTAGE AMOUNT | $          $      9.25 |

| | |
|---|---|
| DATE | 7/31/2013 |
| **WEDNESDAY** | |
| BARTENDER (am) Name | NATALIE |
| BARTENDER (pm) Name | ALICIA |
| BARTENDER (outside pm) Name | HEATHER C |
| SHORTAGE AMOUNT | $          $      8.75 |

| | |
|---|---|
| DATE | 7/25/2013 |
| **THURSDAY** | |
| BARTENDER (am) Name | HEATHER C |
| BARTENDER (pm) Name | CHERIE |
| BARTENDER (outside pm) Name | HEATHER B |
| SHORTAGE AMOUNT | $          $      - |

| | |
|---|---|
| DATE | 7/26/2013 |
| **FRIDAY** | |
| BARTENDER (am) Name | KISHA |
| BARTENDER (pm) Name | CHERIE |
| BARTENDER (outside pm) Name | EMILY |
| SHORTAGE AMOUNT | $          $      5.00 |

| | |
|---|---|
| DATE | 7/27/2013 |
| **SATURDAY** | |
| BARTENDER (am) Name | KALI |
| BARTENDER (pm) Name | CHERIE |
| BARTENDER (outside pm) Name | BRE |
| SHORTAGE AMOUNT | $          $      0.75 |

| | |
|---|---|
| DATE | 7/28/2013 |
| **SUNDAY** | |
| BARTENDER (am) Name | EMILY |
| BARTENDER (pm) Name | KALI |
| BARTENDER (outside pm) Name | |
| SHORTAGE AMOUNT | $          $      25.75 |

$      81.50

SRDR-000294

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | Dollar Amount |
|---|---|---|---|---|---|---|---|---|
| | BEER | BEER | BEER | BEER | BEER | | | |
| | | Cans | Cans | Cans | Cans | | | |
| BUD LITE | 1.75 | | | | 0 | | 0 | 0.00 |
| BUDWEISER | 1.75 | | | | 0 | | 0 | 0.00 |
| COOR LITE | 1.75 | | | | 0 | | 0 | 0.00 |
| MICHELOB ULTRA | 1.75 | | | | 0 | | 0 | 0.00 |
| MILLER HIGH LIFE | 1.75 | | | | 0 | | 0 | 0.00 |
| MILLER LITE | 1.75 | | | | 0 | | 0 | 0.00 |
| BARREL | | | | | 0 | | | |
| | | | | | 0 | | 0 | 0.00 |
| ABITA AMBER | 3.00 | | | | 0 | | 0 | 0.00 |
| BUD ICE | 2.75 | | | | 0 | | 0 | 0.00 |
| BUD LIGHT LIME | 2.25 | | | | 0 | | 0 | 0.00 |
| BUD LIGHT PLATIUM | 2.75 | | | | 0 | | 0 | 0.00 |
| BUD LITE | 2.25 | | | | 0 | | 0 | 0.00 |
| BUD SELECT 55 | 2.25 | | | | 0 | | 0 | 0.00 |
| BUDWEISER | 2.25 | | | | 0 | | 0 | 0.00 |
| BUDWEISER SELECT | 2.25 | | | | 0 | | 0 | 0.00 |
| COOR LITE | 2.25 | | | | 0 | | 0 | 0.00 |
| CORONA | 3.00 | | | | 0 | | 0 | 0.00 |

SRDR-000295

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | Dollar Amount |
|---|---|---|---|---|---|---|---|---|
| DESEQUIS | 3.00 | | | | 0 | | 0 | 0.00 |
| HEINEKEN | 3.00 | | | | 0 | | 0 | 0.00 |
| HEINEKEN LITE | 3.00 | | | | 0 | | 0 | 0.00 |
| MICHELOB ULTRA | 2.25 | | | | 0 | | 0 | 0.00 |
| MILLER 64 | 2.25 | | | | 0 | | 0 | 0.00 |
| MILLER HIGH LIFE | 2.25 | | | | 0 | | 0 | 0.00 |
| MILLER LITE | 2.25 | | | | 0 | | 0 | 0.00 |
| O'DOULS | 2.25 | | | | 0 | | 0 | 0.00 |
| SHOCKTOP | 3.00 | | | | 0 | | 0 | 0.00 |
| SMIMOFF STRAWBERRY | 2.25 | | | | 0 | | 0 | 0.00 |
| ST. PAULIE GIRL | 3.00 | | | | 0 | | 0 | 0.00 |
| STEILA ARTOIS | 3.00 | | | | 0 | | 0 | 0.00 |
| | | | | | 0 | | 0 | 0 | 0.00 |
| BARQ'S | 1.50 | | | | 0 | | 0 | 0.00 |
| COKE | 1.50 | | | | 0 | | 0 | 0.00 |
| COKE ZERO | 1.50 | | | | 0 | | 0 | 0.00 |
| DIET BARQ'S | 1.50 | | | | 0 | | 0 | 0.00 |
| DIET COKE | 1.50 | | | | 0 | | 0 | 0.00 |
| DIET DR. PEPPER | 1.50 | | | | 0 | | 0 | 0.00 |
| DR. PEPPER | 1.50 | | | | 0 | | 0 | 0.00 |

SRDR-000296

DATE:_____/_____/_____

TAKEN BY:_____

| | COST | Other Count | Bar Count SINGLES | Storage Count | TOTAL | COMPUTER COUNT | DIFF. | Dollar Amount |
|---|---|---|---|---|---|---|---|---|
| FUZE TEA | 2.00 | | | | 0 | | | 0.00 |
| MINUTE MAID | 1.50 | | | | 0 | | | 0.00 |
| POWERADE (BLUE) | 1.75 | | | | 0 | | | 0.00 |
| POWERADE (ORANGE) | 1.75 | | | | 0 | | | 0.00 |
| POWERADE (PINK) | 1.75 | | | | 0 | | | 0.00 |
| POWERADE (RED) | 1.75 | | | | 0 | | | 0.00 |
| POWERADE (YELLOW) | 1.75 | | | | 0 | | | 0.00 |
| SPRITE | 1.50 | | | | 0 | | | 0.00 |
| VITAMIN WATER | 2.00 | | | | 0 | | | 0.00 |
| WATER (PLAIN) | 1.50 | | | | 0 | | | 0.00 |
| | | | | | 0 | 0 | 0 | 0.00 |

SRDR-000297

| | |
|---|---|
| **From:** | devin@qualityfabmechanical.com on behalf of Devin St Rose Driving Range <devin@strosedrivingrange.com> |
| **Sent:** | Wednesday, August 21, 2013 5:51 PM |
| **To:** | Peggy Labit |
| **Subject:** | Fwd: |

Please relay to your all employee that there is no getting on Internet nor down loading any type of music or video on pos system computers.



SRDR-000334