1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CIVIL ACTION NO. 14-2020

SECTION "R"     MAG. (3)

DEVIN BARNES

VERSUS

QUALITY FAB & MECHANICAL, LLC,
QUALITY FAB & MECHANICAL CONTRACTORS, INC.,
ST. ROSE DRIVING RANGE, LLC,
AND BRUCE BOURGEOIS

Corporate Deposition of ST. ROSE DRIVING RANGE through its corporate representative BRUCE BOURGEOIS, taken in the above-entitled cause, pursuant to the following stipulation, before Lisa Lanata Boscareno, Certified Court Reporter, taken at the offices of Schonekas, Evans, McGoey & McEachin, LLC, 909 Poydras Street, Suite 1600, New Orleans, Louisiana 70112, on the 29th day of September, 2015.

UNITED COURT REPORTERS, INC.
504-458-0184

EXHIBIT 3

1   A.   Twice a week.

2   Q.   Do you have any supervisory authority
3   over anybody that works at St. Rose?

4   A.   My managers do.

5   Q.   Do you have any supervisory authority
6   over anybody that works at St. Rose?

7   A.   Yeah.

8   Q.   Who do you have supervisory authority
9   over?

10  A.   The managers.

11  Q.   And I want to cover the hierarchy with
12  you, so tell me, let's talk about 2013, which is
13  when we understand Devin Barnes worked there.
14  Who would your managers have been in 2013?

15  A.   I had Peggy Labit, she was the manager,
16  and Devin Barnes was the assistant manager.

17  Q.   Anybody else that was a manager or in
18  management at St. Rose in 2013 besides those two?

19  A.   Yeah.  We had a little management team
20  which was Cherie and Heather, Heather Cannon and
21  Cherie.

22  Q.   Do you know what Cherie's last name is?

23  A.   Daboob, D-A-B-O-O-B, something like
24  that, Daboob.

25  Q.   And what was Peggy Labit's position?  I

1  know you said she was a manager, but was she the
2  general manager or did she have some type --
3       A.    She was the manager.
4       Q.    She was just a manager. Okay. What
5  was Devin Barnes' position?
6       A.    He was the assistant manager.
7       Q.    What was Cherie Daboob's position?
8       A.    She was a team leader.
9       Q.    And what was Heather Cannon's position?
10      A.    Also a team leader.
11      Q.    Has Ms. Labit been a manager the entire
12 time she has worked for St. Rose?
13      A.    Repeat that, I am sorry.
14      Q.    Has Ms. Peggy Labit been a manager the
15 entire time she was worked at St. Rose?
16      A.    Yeah.
17      Q.    So if you identified her as a cook in
18 your discovery responses, that wouldn't be
19 accurate, right?
20      A.    No, but she is also a cook. She
21 started as a cook.
22      Q.    In 2013, was she a cook or was she a
23 manager?
24      A.    She was a manager.
25      Q.    Other than supervising the managers,

1  office there.
2      Q.    Are there any other companies that have
3  their office space at 10362 Airline?
4      A.    No.
5      Q.    That's the only company?
6      A.    (Witness nods head affirmatively.)
7  Yeah.
8      Q.    Quality Fab doesn't have an office
9  there?
10     A.    (Witness shakes head negatively).  No.
11     Q.    Let's talk about 2013 and stay focused
12 on that for the moment.  Underneath your
13 management group that you have mentioned for me,
14 who would have been employed?  And I am not
15 looking for names, I am looking for jobs, job
16 titles.  Who would you have under the management
17 group?
18     A.    You would have had the manager, the
19 assistant manager, and a couple of team leaders.
20     Q.    Right.  And then who would be under
21 them?
22     A.    And you would have bartenders, pro shop
23 person.  By pro shop, I mean a girl who rings up
24 the balls and hands out balls.  You know, you
25 come in, order a bucket of balls, she grabs them,

1  brings them up, hands them to you. We call that
2  the pro shop. And there might have been a yard
3  guy.
4      Q.   Were there any waiters or waitresses?
5      A.   Uh-uh (in the negative). Well, yes.
6  In other words, that pro shop girl would also
7  double as a waitress because there is only like
8  six tables or eight tables.
9      Q.   Is there more than one suite at 10362
10 Airline?
11     A.   More than one what?
12     Q.   Suite.
13     A.   Suite?
14     Q.   Yeah. S-U-I -- no?
15     A.   No.
16     Q.   Let me show you what I will mark as
17 Exhibit 2 which is a printout from the Secretary
18 of State's Office.
19     MR. TUSA:
20          Pat, I have an extra copy.
21     MR. McGOEY:
22          Great. Thank you.
23          (The foregoing document was identified
24 and attached as Exhibit 2.)
25     MR. TUSA:

                                                          61

1        A.    Yes.
2        Q.    Now, you have indicated that Devin was
3   hired as a -- Devin Barnes was hired as an
4   assistant manager, right?
5        A.    Yes.
6        Q.    Let me show you what I will mark as
7   Exhibit 6 which was produced in discovery, Bates
8   stamped 36 to 40, and ask if you have seen that
9   document before?
10       A.    This is duty.
11       Q.    This is what?  I am sorry?
12       A.    This is a duty sheet, yes.
13       Q.    This is a duty sheet, right.  Have you
14  seen this before?
15       A.    Parts of it, yeah.
16       Q.    And do you know whose handwriting that
17  is at the top that says Devin Barnes?
18       A.    No.
19             (The foregoing document was identified
20  and attached as Exhibit 6.)
21  BY MR. TUSA:
22       Q.    Who prepared this duty sheet?
23       A.    The manager.
24       Q.    Which manager?
25       A.    Of St. Rose Driving Range.

 1     Q.   Which one?
 2     A.   And probably Peggy and my wife and
 3  probably Stephanie, they got together.
 4     Q.   And then put together these job duties.
 5  These are job duties for the assistant manager?
 6     A.   Well, it is a general reference, yes.
 7  MR. McGOEY:
 8          I'm going to object to the form. This
 9  is incomplete.
10  MR. TUSA:
11          What?
12  MR. McGOEY:
13          I am going to object to the form to the
14  extent that this Exhibit 6 is incomplete.
15  BY MR. TUSA:
16     Q.   Take a look at this document, sir. Is
17  this the duty sheet that you are familiar with
18  for assistant manager?
19  MR. McGOEY:
20          Object to the form.
21  BY MR. TUSA:
22     Q.   Subject to his objection.
23  MR. McGOEY:
24          I mean you have the whole packet. You
25  are not showing him the whole packet is my point.

1  what was his prior testimony, compound.
2  BY MR. TUSA:
3       Q.    Can you answer my question, sir?
4       A.    I think they were constantly upgrading
5  the duties.
6       Q.    I don't think that answers it, so let
7  me try it this way.
8       A.    Well, that's all I know.
9       Q.    Did Mr. Barnes do any of the job duties
10 that are on here?
11      A.    I don't know.
12      Q.    You are here as a corporate
13 representative.  You can't tell me whether he did
14 any of the job duties that are on here?
15      A.    No.  I am sure he might have.
16      Q.    You sure he have might have?
17      A.    He might have, yeah.
18      Q.    Did he or didn't he?
19      A.    He might have.
20      Q.    Can you answer my question, whether he
21 did or he did not?
22      A.    Well, let me read them, you know.
23      Q.    Go ahead.
24      A.    Yes.  Some of these items he might have
25 done or got done.

1  that indicated they were a packet. That's my --
2  that's the point I am making.
3       MR. McGOEY:
4           If you want me to go look at the
5  production, I can give you the Bates stamp.
6       MR. TUSA:
7           I am going to just go through them and
8  cover them.
9       MR. McGOEY:
10          I understand.
11 BY MR. TUSA:
12      Q.  Let me show you what I will mark as
13 Exhibit 8 which is a document labeled time cards.
14 Can you look at that?
15      A.  I am still looking at Exhibit 7. Is
16 this asking --
17      MR. McGOEY:
18          Just answer his question. He is asking
19 you to direct your attention to Number 8. Thank
20 you.
21          (The foregoing document was identified
22 and attached as Exhibit 8.)
23 BY MR. TUSA:
24      Q.  Is this a document that Mr. Barnes was
25 required to sign when he started working at

1  St. Rose?
2      A.   Yes.
3      Q.   And is this a document that all of the
4  independent contractors had to sign?
5      A.   That all employees signed.
6      Q.   Independent contractors and employees,
7  correct?
8      A.   Right.
9      Q.   You understand there is a distinction
10 between an employee and an independent
11 contractor?
12     A.   Yes.
13     Q.   Let me show you what I will mark as
14 Exhibit Number 10 which is a document labeled
15 Wages Payable Law, and ask if this is a document
16 that Mr. Barnes had to sign when he started
17 working at St. Rose?
18     A.   I am sure it was in the packet, yeah.
19          (The foregoing document was identified
20 and attached as Exhibit 10.)
21 BY MR. TUSA:
22     Q.   And is it a document that the other
23 independent contractors would have had to sign
24 before working at St. Rose?
25     A.   Any and all employees.

1  Q. Let me show you a document we looked at
2  earlier which is the interrogatory answers and
3  there is a listing of individuals and how much
4  they were paid and when they started and when
5  they ended. You have got that in your stack, but
6  you see the wage rates that are there, 7.50, $9
7  an hour, $10 an hour? You see that?
8  A. Oh, yeah.
9  Q. Who would have set these wage rates for
10 these individuals?
11 A. Management.
12 Q. Well, did management have any
13 instruction as to what ranges they could offer?
14 A. Yeah. It is usually between 8 and $10
15 an hours. Some of these people I hired.
16 Q. Let's go step by step.
17 A. It is what it is.
18 Q. Let's go step by step. The range,
19 okay, that you are talking about, who would have
20 given the St. Rose managers the range of 8 to $10
21 an hour? In other words, who told them that they
22 could hire within that range?
23 A. Myself.
24 Q. You have got the list in front of you.
25 A. Lorna. My secretary.

1   Q.   So either you, Lorna, or Stephanie?
2   A.   Right.
3   Q.   You have got the list in front of you.
4  Can you look at that list and tell me which ones
5  you personally hired?
6   A.   I don't know if I can remember them
7  all, but --
8   Q.   Well, any ones you can remember.
9   A.   Yeah.  I can remember Antoine, the
10 cook.
11  Q.   Give me a last name.
12  A.   Ballansaw.
13  Q.   Ballansaw?
14  A.   Yeah, Ballansaw.
15  Q.   Look, go ahead down the list and see if
16 you see any other ones that you personally hired.
17 And if you can do me the favor of not checking
18 them, I would appreciate that.
19  A.   Sorry.
20  Q.   That's okay.
21  A.   Devin.
22  Q.   Okay.  You hired Devin Barnes?
23  A.   Right.  Heather.
24  Q.   Cannon.
25  A.   Heather Bleakley.

1   Q. Heather Bleakley. Okay.
2   A. There is a few more in here I don't
3   recognize. Heather Cannon, I --
4   Q. You hired her?
5   A. I don't remember. I don't know.
6   Q. Not sure?
7   A. Not sure. Cameron Crumholt, I hired
8   him. Cherie.
9   Q. Dabdoub?
10  A. Yeah.
11  Q. You hired her?
12  A. I think I did. I am not sure, but I
13  think I did.
14  Q. Okay.
15  A. And the rest, I am not sure.
16  Q. Look on the next page because that list
17  continues on the next page. You see if there is
18  any of those that you recognize as having hired
19  directly?
20  A. James shiltzender, Silkknitter.
21  Q. James?
22  A. Yeah.
23  Q. Is that the first name?
24  A. Yeah. I am pretty sure I hired him.
25  Q. All right.

1    Q.   Let's go back in time to make sure like
2  2013, 2012, would you have had any employees
3  working there that worked more than 40 hours a
4  week?
5    A.   It is possible.
6    Q.   What about independent contractors,
7  would they work more than 40 hours a week in
8  2012, 2013?
9    A.   It is possible.
10   Q.   It is possible.  Okay.
11   A.   I mean normally a bartender would get
12 two to three shifts, so it is kind of hard to
13 work more than 40 hours, I mean with two shifts,
14 you know, three shifts.
15   Q.   How many shifts would the manager Peggy
16 Labit work?  Let me do it this way:  How many
17 days a week would Peggy Labit work?
18   A.   I don't know exactly back then, but
19 they had two team leaders which is Heather and
20 Cherie.  They would also -- they has the ability
21 to close.  So like, for instance, Peggy would
22 close that day, but she would come in, do the
23 registers, leave, and sometimes come back if they
24 were real busy or whatever.  Sometimes --
25 oftentimes not, the girl -- the team leader had

1  the ability to close.
2        Q.   Close up?
3        A.   Yeah.  And all it is just doing the
4  till and putting the money into the envelope and
5  dropping it in the slot.
6        Q.   And the team leader, the two ladies
7  that you mentioned were also bartenders, right?
8        A.   Right.
9        Q.   Am I understanding that?  Do you know
10 how many days a week Devin worked when he was
11 working there?
12       A.   No.
13       Q.   Do you know which shift he normally
14 worked if --
15       A.   (Witness shakes head negatively).
16       Q.   No?
17       A.   I think it was night shift.
18       Q.   So if I am understanding you correctly,
19 as the corporate rep, you are not aware of St.
20 Rose classifying any of its employees as exempt
21 or non-exempt because you don't even know what
22 that means, right?
23       MR. MCGOEY:
24            Object to the form.
25       THE WITNESS:

1    Q.   Well, but Quality Fab is your company,
2  right?
3    A.   Right.
4    Q.   Are you aware of any contracts between
5  them other than the payroll?
6    A.   I am not aware of any.
7    Q.   Now, do you recall that there was a
8  loan given to Devin Barnes?
9    A.   Yeah.
10   Q.   For $5,000?
11   A.   Yeah.
12   Q.   Let me show you what I will mark as
13 Exhibit 28 which is a document labeled -- dated,
14 excuse me, August 28, 2013 on Quality Fab and
15 Mechanical, LLC letterhead.
16       (The foregoing document was identified
17 and attached as Exhibit 28.)
18 BY MR. TUSA:
19   Q.   Is this the document, as best you know,
20 that codifies the loan that was made to him?
21   A.   Yeah.  I remember him asking me for it.
22 He said he needed a car, didn't have a dollar to
23 his name.
24   Q.   Is that your signature?
25   A.   Yeah.

1   Q.   And this indicates that there would be
2   bi-weekly payments in the amount of $200 made as
3   a result of the loan, right?  Did that occur?
4   A.   I am sure it did.
5   Q.   Would it have come out of his pay from
6   working?
7   A.   Yeah.
8   Q.   Let me show you -- do you remember what
9   his salary was that he was paid?
10  A.   Five something, 550, 600, somewhere
11  around.
12  Q.   This may explain.  Let me show you what
13  I will mark as Exhibit 29 which is just a random
14  check dated July -- excuse me dated June 28,
15  2013, from Quality Fab to Devin Barnes for $330.
16  Okay.
17       (The foregoing document was identified
18  and attached as Exhibit 29.)
19  BY MR. TUSA:
20  Q.   Does this refresh your memory that he
21  was paid 530?
22       MR. MCGOEY:
23            Object to the form.
24  BY MR. TUSA:
25  Q.   No?  Do you know what - does this help

1    Q.   Would you drink when you went there,
2  drink alcohol?
3    A.   Sometimes, yeah.
4    Q.   Did you ever drink enough that you
5  couldn't drive home?
6    A.   Yeah, once or twice.
7    Q.   When that happened, did you sleep in
8  the bed that's in the upstairs?
9    A.   No.
10   Q.   Has St. Rose or Quality Fab ever been
11 investigated by the Department of Labor for any
12 labor violations?
13   A.   There was an investigation about five,
14 six years ago.
15   Q.   What was that in reference to?
16   A.   It wasn't five years ago. It is
17 probably two or three years ago. That was
18 related to working people subcontract right
19 around this time when this happened with Devin.
20 And that's when we learned that it wasn't legal
21 to really do that. We didn't know that.
22   Q.   Let me back you so that I am following
23 you. Which company was investigated?
24   A.   Quality Fab.
25   Q.   And you say it was investigated by the

1  Department of Labor on concerning subcontracting?
2      A.   Right.
3      Q.   Do you mean subcontracting or making
4  people independent contractors?
5      A.   Well, working them as independent
6  contractors.
7      Q.   And what were you told you say?
8      A.   They told us that you really couldn't
9  do that. And that's the first time we learned
10 that.
11     Q.   And did you think this was two to three
12 years ago, so we're talking 2013, 20 --
13     A.   Somewhere around there, yeah.
14     Q.   Did you change your practices as a
15 result?
16     A.   Yes.
17     Q.   And so are there any independent -- any
18 individuals working at St. Rose as independent
19 contractors now?
20     A.   There should not be, no.
21     Q.   Were you required to pay any back pay
22 to any employees or any, excuse me, any
23 individuals?
24     A.   Yes.
25     Q.   Was the DOL investigation before or

1  after Devin Barnes worked there?
2       A.   I don't remember.  It was probably
3  after.
4       Q.   Did you reach out to Mr. Barnes to pay
5  him any back pay that he might have been owed as
6  a result?
7       A.   If he was on the list.  They gave us a
8  list of names.  I don't know if he was on the
9  list or not.
10      Q.   Do you have paperwork that you received
11 from the Department of Labor concerning that
12 investigation?
13      A.   I am sure we do.
14      MR. TUSA:
15           Pat, I really don't remember off the
16 top of my head if that's something I asked for or
17 not.  I know it is not something I got.  You may
18 be hearing about it for the first time as well.
19 I will go back and check my discovery.
20      MR. MCGOEY:
21           I don't have any paperwork on it, so.
22      MR. TUSA:
23           I will go back and check my discovery
24 to see if I asked for it.  If not -- if I did, I
25 will dun you.  If not, I will follow up.  I just